FILED
09/26/2017
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017

## STATE OF TENNESSEE v. WILLIAM "BILL" DOUGLAS FARR, SR.

**Appeal from the Circuit Court for Lawrence County**
**No. 32589      Stella L. Hargrove, Judge**

───────────────

**No. M2016-01216-CCA-R3-CD**

───────────────

The Defendant, William "Bill" Douglas Farr, Sr., was convicted by a Lawrence County Circuit Court jury of rape of a child, a Class A felony, and was sentenced to forty years in the Tennessee Department of Correction. On appeal, the Defendant argues that: (1) the State committed prosecutorial misconduct during closing argument by vouching for the credibility of a witness and repeatedly referring to the Defendant as a "monster"; (2) the trial court erred in failing to give specific unanimity and election of offenses jury instructions; (3) the evidence is insufficient to sustain his conviction; and (4) the trial court applied the incorrect law in determining his sentence. After review, we affirm the Defendant's conviction but modify his sentence to twenty-five years and remand for entry of an amended judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified and Remanded for Amended Judgment

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

William Joshua Morrow, Lawrenceburg, Tennessee (on appeal); and Kevin Latta, Columbia, Tennessee (at trial), for the appellant, William "Bill" Douglas Farr, Sr.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Brent A. Cooper, District Attorney General; and Gary M. Howell and Christi L. Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The Defendant was indicted for two counts of rape of a child based on allegations that he sexually penetrated his two young granddaughters between the dates of July 2011 and August 2012. The count relative to one of the girls was nolle prosequied, and the State proceeded to trial on the count relative to the victim, who was ten years old at the time of trial in September 2015.

At trial, the victim testified that she and her mother, father, and sister moved to Tennessee from Wisconsin when she was going into the first grade. Her family lived with her grandparents at first, but they later moved into their own home "[n]ot far" from her grandparents. Her grandmother passed away sometime after they moved to Tennessee.

The victim testified that the parts of her body that others are not supposed to touch are her "private part and . . . butt." She said that her "private part" is "in the middle of [her] body" and is covered by "underwear and . . . pants." The victim recounted that the Defendant touched her in her "private area" on occasions when her mother dropped her and her older sister off at his house. She said that the three of them would go into the Defendant's bedroom, take their clothes off, and "[h]e would start licking [their] private parts." The victim stated that there were also times when she touched the Defendant's private part with her hands. She said, "He had this pow[d]er, I guess, and I would just rub it on there." The victim described that the Defendant's private part was located in the same part of the body as hers but "was bigger." She recalled that on one occasion "[p]ee, I think" came out of the Defendant's private part when she "was shaking it . . . [u]p-and-down." When that happened, she was sitting up and the Defendant was lying down.

In response to questioning, the victim said that she thought the Defendant licked her private part on the "outside" of it, on the skin. The victim recalled a time when the Defendant "tr[ied] to fit his private in [hers] and then he said, 'When I would get older, it would fit.'" When that happened, she was sitting in the Defendant's bedroom and their clothes were off. The victim stated that, when the Defendant licked her private part, she was sitting on "[h]is face," but she could not recall how it came about for her to be in such a position. The victim said that the things that happened with the Defendant occurred on different days, but all during the time when she was going into first grade.

On cross-examination, the victim recalled that the Defendant touched her private part with his tongue on "[a] few" different occasions. She said that when he licked her private area, he licked "[o]n top," and his tongue did not go inside of her private part. On

redirect examination, the victim said that she did not think "girls have a hole in their privates."

Amy Moore, a criminal investigator with the Lawrence County Sheriff's Office, testified that she was contacted by the Department of Children's Services on May 22, 2014, regarding the allegations of sexual abuse against the Defendant. A forensic interview with the victim and her sister was arranged, and Investigator Moore observed the interviews. Afterwards, Investigator Moore "tried to make contact with [the Defendant] by phone a couple of times and traveled to his house." On June 23, 2014, Investigator Moore and Lieutenant Nathan Neese met with the Defendant at the sheriff's office. After being advised of his rights, the Defendant indicated that he was willing to talk to the investigators. They informed the Defendant of the allegations against him, and the Defendant "was appalled that his daughter[, the victim's mother,] wouldn't come to him first about it instead of us talking to him." He told the investigators that "there is more to this than what meets the eye." When asked to elaborate, the Defendant "said that he wasn't going to discuss it with us." He then told the investigators that the victim and the victim's older sister "knew more about sex than he did at that age." The Defendant talked about his granddaughter's stepbrother who used to live with them and suggested that "maybe somebody else was responsible for teaching them kind of what they had known." He told the investigators "that he wasn't going to admit to something he didn't do."

Investigator Moore testified that, after taking a break, the interview resumed with the Defendant telling the investigators "how he loved the girls and that he didn't know what was going on, but that they knew too much. . . . [H]e said that it's from what he had seen and what they have shown him." When asked to elaborate on what he meant by "[w]hat they've shown him," the Defendant "said that he couldn't discuss that." However, he then asserted that the victim's sister was "the instigator and that she would whisper into [the victim]'s ear and that [the victim] would do whatever, that things would happen." The Defendant refused to discuss exactly "what things would happen," maintaining that he needed to talk to his daughter, the victim's mother, because "'[i]t's between a father and daughter.'" Asked if he would be willing to talk to the investigators if his daughter was in the room, the Defendant "said that he didn't know, that he would have to think about it."

Investigator Moore testified that, after the interview, they contacted the Defendant's daughter to see if she would be willing to talk to the Defendant while they recorded the conversation. After taking some time to consider the request, she agreed to make the call and did so from the sheriff's office on July 18, 2014. Investigator Moore was in the room during the conversation, but Investigator Moore only heard "bits and

pieces" of what the Defendant said. However, a recording was made, and Investigator Moore later listened to the recording to hear both sides of the conversation.

The victim's mother testified that her family moved to Tennessee from Wisconsin in July 2011, where the Defendant, her father, lived. The victim's mother and her family lived with the Defendant for a year, while the house they had bought was being repaired. The victim's mother and her husband both worked during that time, so the Defendant babysat the victim and her sister. At some point in time, the victim's mother became aware of possible inappropriate behavior between the Defendant and her daughters and spoke with investigators about it. The investigators asked her to call the Defendant, while they recorded the conversation. The recording of that phone call was played for the jury.

During the phone call, the Defendant told the victim's mother that someone was not telling the truth. He explained that the victim and her sister asked him to watch television with them in the bedroom. When he got into the bedroom, the girls told him to take his shorts off because they "want[ed] to see something." The Defendant said that he obliged, thinking that he would "see what's going on here." He said that the girls took off his shorts and one girl got on his chest and the other on his feet, holding him down. The Defendant explained that he thought he would "just see how much they know." The victim's mother replied to the Defendant that he was the adult, "why would he let them do that?" The Defendant answered, "I wanted to see how much they knew and where they learned it from. What's gonna happen? I'm seventy years old."

After the victim's mother challenged him again, the Defendant told her of a second time when the victim and her sister "ripped [his] shorts off." He said that he asked them where they were learning such behavior, and they told him to "shut up and lay still." He refused and claimed that, thereafter, the victim and her sister vandalized the house.

The victim's mother asked whether anything happened on a day he said he had taken a bath with the girls, and the Defendant said that nothing happened. When the victim's mother explained that she was upset that the Defendant would engage in inappropriate behavior with her daughters, the Defendant maintained that he was trying to find out where they learned what they were doing. The Defendant attempted to deflect the victim's mother's outrage by suggesting that the girls' stepbrother might have been responsible for their aggressive sexual behavior. He also claimed that the victim's older sister "was the instigator of all this" and knew more than she should for her age.

Later in the conversation, the victim's mother asked the Defendant if the girls touched him during these encounters or what exactly happened, and the Defendant

-4-

recalled that the victim tried to put his penis in between her legs and, laughing, said that he "couldn't get a hard-on if [he] tried. And – so nothing happened." Returning to his taking a bath with the girls, the Defendant acknowledged that he "thought it was kind of weird . . . but . . . that's what they wanted."

When the victim's mother squarely confronted the Defendant with the girls' allegations, the Defendant said that he did not touch them in their private areas and again told of the incident when the victim tried to put his penis in her private area while he was lying naked on the bed. The Defendant laughed as he told of the incident, and the victim's mother asked why he thought it was funny. The Defendant responded, laughing, "Because – you ever try to put a wet noodle in a hole?" The victim's mother asked how the girls could have known to say that the Defendant "had exploded on them and . . . white stuff came out" if that was something they did not see, but the Defendant could not explain. The Defendant said that the victim's older sister told the victim what to do "to get [him] hard" and that the victim "was slamming [his] penis until it . . . exploded." When confronted about what else he was not telling his daughter, the Defendant maintained that nothing else happened between him and the girls that he had not already admitted during their conversation. He denied that either girl ever "sat on his face."

Throughout the conversation, the Defendant continually explained that he let the things happen with the victim and her sister because he wanted to see what they knew and also because he was afraid the girls would be punished if he mentioned that they seemed to know how to behave sexually. In response to the victim's mother's highly emotional claim that the Defendant abused her daughters, the Defendant said, "I wasn't abusing them. They were abusing me."

Erica Prince, with the Department of Children's Services, discussed the process for investigating concerns that a child was being abused or neglected. Ms. Prince observed the interview of the victim regarding the allegations of sexual abuse in this case. After the interview, the victim was sent for a medical examination. Cindy Powell, a forensic interviewer for Kid's Place Child Advocacy Center, conducted the interview of the victim.

## ANALYSIS

### I. Prosecutorial Misconduct

The Defendant argues that the State engaged in prosecutorial misconduct by "improperly vouching for the credibility of [the victim], and by repeatedly referring to [him] as a 'monster' during its closing argument." The Defendant acknowledges that he would only be entitled to relief on this issue under the plain error doctrine.

In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

The five generally recognized areas of prosecutorial misconduct occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. State v. Middlebrooks, 995 S.W.2d 550, 559 (Tenn. 1999). In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

The Defendant first complains that the State "improperly vouched for the victim's credibility, encouraged the jury to base its verdict on sympathy for the victim, and diverted the jury from its duty to decide the case on the evidence" with the following comments: "[The victim] came into this courtroom and bravely asked you for justice.

-6-

Cases like this are always nerve wracking when you're looking at a child coming into the courtroom and testifying, but this child surpassed anything I could have imagined her being able to do in here." Later, the State argued that "[the victim] was brave enough to come in here and ask you to stop [the Defendant]. And now the State asks you to stop him by convicting him of Rape of a Child."

In light of the fact that the testimony of the victim established the elements of the offense and the Defendant's recorded admissions of sexual misconduct corroborated the victim's claims, the State's mild comments about the victim's acting bravely in appearing and testifying before the court cannot be viewed as adversely affecting a substantial right of the Defendant by having any effect on the verdict.

The Defendant also complains that the State referred to him as a "'monster' multiple times," which "potentially appealed to the bias and passion of the jury." The record shows that the State did indeed, without objection, refer to the Defendant as "a monster" on three occasions during closing argument and one more time during rebuttal closing argument. However, again, the testimony of the victim established the elements of the offense, and the Defendant's recorded admissions of sexual misconduct corroborated the victim's claims. While we do not endorse the prosecutor's referring to the Defendant as a "monster," we conclude that the statements did not adversely affect a substantial right of the Defendant by having any effect on the verdict.

## II. Jury Instructions

The Defendant argues that "the trial court erred by failing to give specific unanimity and election of offense jury instructions." He elaborates that the trial court "failed to adequately instruct the jury that its members must *unanimously* agree that [he] committed the elected offense, and that the evidence introduced by the State established the elements of the elected offense beyond a reasonable doubt." The Defendant acknowledges that he would only be entitled to relief on this issue under the plain error doctrine.

Again, in order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

-7-

The State elected that it would proceed on the offense of rape of child based on "[t]he incident described by [the victim] as sitting on the face of [the Defendant] and him licking her privates in his bedroom in St. Joseph, Tennessee."

In charging the jury, after discussing the elements of the charged offense and lesser-included offenses, the trial court gave various other instructions, including a unanimity instruction:

> Your verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> . . . .
>
> And in the course of your deliberations, do not hesitate to re-examine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or the effect of evidence solely because of the opinion of your fellow juror or for the mere purpose of returning a verdict.

The trial court then explained the process of reaching a verdict and discussed the sections of the jury form, referring first to the possible findings for the charged offense of rape of a child. The trial court stated: "If you unanimously find [the Defendant] guilty of this charge, your foreperson will sign and date this form, and return with it to the courtroom. If you unanimously find that he is not guilty of Rape of a Child, then you go to Number Two[.]"

The court then explained the State's election of the charged offense:

> And let me say now that we made an election as we need to do in a trial like this. This is the election right up under the case number that you'll be considering from all the testimony, only this incident[:] "The incident described by [the victim] as sitting on the face of [the Defendant] and him licking her privates in his bedroom in St. Joseph, Tennessee."
>
> That's the decision to make on that incident and no other incident that you've heard. Any questions?

The Defendant seems to suggest that the trial court's instructions were lacking or improper because they were not a verbatim statement of the Tennessee Pattern Jury Instruction concerning jury unanimity in election cases.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). Tennessee law does not mandate that any particular jury instructions, or "pattern instructions," be given so long as the trial court gives a complete charge on the applicable law. See State v. James, 315 S.W.3d 440, 446 (Tenn. 2010); State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

Despite the Defendant's apparent presumption otherwise, the pattern jury instructions are not controlling. See James, 315 S.W.3d at 446 ("Trial courts are not limited to the mere recitation of the pattern instructions."); State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997) ("[P]attern jury instructions are not officially approved by this Court or by the General Assembly and should be used only after careful analysis. They are merely patterns or suggestions.").

The trial court clearly instructed the jury that its verdict must be unanimous and plainly stated the specific allegation upon which it should deliberate, with the jury's decision to be made "on that incident and no other incident that you've heard." The Defendant has failed to show the breach of a clear and unequivocal rule of law, that any substantial right was affected, or that any action by this court is necessary to do substantial justice.

### III. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his conviction because the State failed to prove the element of penetration.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7).

The Defendant argues that the State failed to prove that he "placed his mouth or tongue *in* [the victim's] vagina." However, "[c]unnilingus, a sexual activity involving oral contact with the female genitals, does not require that the mouth or tongue actually

-10-

penetrate into the vagina." State v. John Ray Thompson, Nos. M2003-00487-CCA-R3-CD, M2003-01824-CCA-R3-CD, 2004 WL 2964704, at *13 (Tenn. Crim. App. Dec. 20, 2004) (citations and internal quotations omitted). "While touching alone without intrusion would not constitute penetration under our statute, licking does. Penetration includes cunnilingus which has been defined by our courts as 'oral contact with the female genitals.' Oral penetration into the vagina is not required." State v. Reginald L. Parker, No. 02C01-9306-CR-00130, 1994 WL 716272, at *2 (Tenn. Crim. App. Dec. 28, 1994). The victim testified that the Defendant licked her private part and did so while she was sitting on his face. Viewed in the light most favorable to the State, a rational trier of fact could find the Defendant guilty of rape of a child.

## IV. Sentencing

The Defendant lastly argues that "[t]he trial court erroneously applied the 2011 amendment to Tenn. Code Ann. § 39-13-522, which took effect on January 1, 2012, to his conviction in this case." He asserts that "the elected offense *could* have occurred anytime from July 1, 2011 to July 1, 2012. Therefore, the State did not prove that the offense occurred on or after January 1, 2012" in order to apply 2012 law.

The current version of Tennessee Code section 39-13-522(b)(2)(A) provides:

> (b)(1) Rape of a child is a Class A felony.
>
> (2)(A) Notwithstanding title 40, chapter 35, a person convicted of a violation of this section shall be punished as a Range II offender; however, the sentence imposed upon such person may, if appropriate, be within Range III but in no case shall it be lower than Range II.

Tenn. Code Ann. § 39-13-522(b)(2)(A) (2012). The prior version of the same section provided:

> Notwithstanding title 40, chapter 35, a person convicted of a first or subsequent violation of this section shall be punished by a minimum period of imprisonment of twenty-five (25) years. The sentence imposed upon any such person may, if appropriate, exceed twenty-five (25) years, but in no case shall it be less than the minimum period of twenty-five (25) years.

Id. § 39-13-522(b)(2)(A) (2010).

In construing the 2010 version of the statute, this court has explained:

Rape of a child is a Class A felony, the range of punishment for which is fifteen to sixty years. T.C.A. § 40-35-112(a)(1) (2010). The statute provides that if the person convicted of this offense is sentenced in a higher range, *i.e.* as a multiple or persistent offender, then the sentence for each conviction may be set higher than the required twenty-five-year minimum sentence, if appropriate. By inference, if the defendant is sentenced as a Range I offender, as the maximum sentence for that range is twenty-five years, the sentence to be imposed must be twenty-five years for each offense of rape of a child.

State v. Rhonda Louise Medley, No. M2009-02446-CCA-R3-CD, 2011 WL 2739512, at *7 (Tenn. Crim. App. July 12, 2011), perm. app. denied (Tenn. Nov. 16, 2011).

At the sentencing hearing, the trial court initially stated that, because the Defendant, a Range I offender, was convicted of a Class A felony, he was facing a sentence of fifteen to twenty-five years. The State replied that "the statute requires that we start at a Range II, which is 25 [years]." Defense counsel agreed with the prosecutor's assessment of the applicable range. The trial court also agreed and found that the applicable sentencing range for the Defendant was, therefore, twenty-five to forty years.

Again, the Defendant asserts that the State did not prove that he committed the offense before January 1, 2012, such that he could be sentenced under 2012 law. He notes that the evidence showed that the victim and her family lived with him from July 2011 to July 2012, and it was sometime during this time period that the offense at issue occurred but no proof to when exactly. The Defendant cites to an unpublished opinion of this court that was designated "not for citation" by the Tennessee Supreme Court, State v. Pedro Ignacio Hernandez, No. M2013-01321-CCA-R3-CD, 2014 WL 3740028, at *37-38 (Tenn. Crim. App. July 29, 2014), perm. app. denied (Tenn. Dec. 19, 2014), for his assertion that the trial court erred in applying 2012 law, and thus his sentence should be modified to the twenty-five-year sentence that he would have received under pre-2012 law.

Even though the record shows that defense counsel conceded at the sentencing hearing that Range II was the appropriate sentencing range for the Defendant's rape of a child conviction, the evidence did not establish a specific date for the offense beyond the time period contained in the indictment of July 1, 2011 to July 1, 2012. Thus, there was no proof that the offense occurred after the amendment to the statute. Accordingly, we conclude that the trial court erred in applying the sentencing provisions as modified in 2012 and therefore modify the Defendant's sentence to the twenty-five-year sentence he would have received under pre-2012 law. See State v. Christopher Scottie Itzol-Deleon,

-12-

No. M2014-02380-CCA-R3-CD, 2016 WL 1192806, at *32-33 (Tenn. Crim. App. Mar. 28, 2016), aff'd on other grounds, __ S.W.3d __, 2017 WL 3668453, at *1 (Tenn. Aug. 25, 2017).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the Defendant's conviction but modify his sentence to twenty-five years and remand for entry of an amended judgment.

_____
ALAN E. GLENN, JUDGE